Bonifacio Vitug SAGANA,
Plaintiff–Appellant,

v.

Joaquin A. TENORIO, in his official capacity as Secretary of the Department of Labor and Immigration, Commonwealth of the Northern Mariana Islands, Defendant–Appellee.

No. 03–15779.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 30, 2004.

Filed Sept. 7, 2004.

As Amended, Oct. 18, 2004.

Joe Hill, Saipan, MP, for the plaintiff-appellant.

James D. Livingstone, Assistant Attorney General, Saipan, MP, for the defendant-appellee.

Before: SCHROEDER, Chief Judge, GOODWIN, and WALLACE, Circuit Judges.

GOODWIN, Circuit Judge.

Bonifacio Vitug Sagana appeals the district court's denial of his motion for summary judgment challenging the Nonresident Workers Act ("NWA"), 3 N. Mar. I.Code § 4411 *et seq.* (1999), of the Commonwealth of the Northern Mariana Islands ("CNMI"). He argues that the NWA restricts his right to freely market his labor in violation of 42 U.S.C. § 1981 and the Fourteenth Amendment's equal protection and due process clauses. The defendant, Joaquin Tenorio, was sued in his official capacity as the Secretary of the Department of Labor of the CNMI.

The district court dismissed all of Sagana's claims with prejudice. We affirm.

## BACKGROUND

### I. The CNMI

After the end of World War II, the United Nations designated most of the Micronesian Islands, including the Northern Mariana Islands, as the Trust Territory of the Pacific Islands. The United States became the Trust Territory's administrator, with the responsibility of "promot[ing] the development of the inhabitants of the trust territory toward self-government or independence." *United States ex rel. De Leon v. Guerrero,* 4 F.3d 749, 751 (9th Cir.1993) (internal quotation marks omitted) (quoting Trusteeship Agreement for the Former Japanese Mandated Islands, 61 Stat. 3301, T.I.A.S. No. 1665, art. 6, § 1 (1947)).

In 1969, the United States began negotiations with the Congress of Micronesia to determine the future political status of the islands. The Marshall Islands, Palau, and Federated States of Micronesia ultimately became independent states, their relationship with the United States governed by compacts of free association. Unlike

neighboring Pacific states, the Northern Mariana Islands split from the rest of the Pacific states and negotiated a permanent political union with the United States. The Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America was signed on February 15, 1975, and came into force through Congress's Joint Resolution on March 24, 1976. Pub.L. No. 94–241, 90 Stat. 263 (1976), *reprinted in* 48 U.S.C. § 1801 note (hereinafter "Covenant"). The United States officially terminated the trusteeship over the CNMI on November 3, 1986. *Guerrero,* 4 F.3d at 751 (citing Proclamation No. 5564, 51 Fed.Reg. 40,399 (1986), *reprinted in* 48 U.S.C. § 1681 note).

The Covenant establishes the United States' sovereignty and "ultimate political authority" over the CNMI. Covenant § 101; Marianas Political Status Comm'n, *Section–by–Section Analysis of the Covenant To Establish a Commonwealth of the Northern Mariana Islands* 7 (1975) ("*Section–by–Section Analysis*"). It gives the United States "complete responsibility for and authority with respect to matters relating to foreign affairs and defense...." Covenant § 104. The Covenant expressly makes certain portions of the Constitution, and most laws in existence at the time of the Covenant's enactment, applicable to the CNMI. *Id.* §§ 501, 502. In addition, Congress is given the power to pass laws affecting the CNMI by specifically naming the CNMI in any piece of legislation consistent with the Covenant. *Id.* § 105.

■ The United States' authority over the CNMI is not, however, absolute. This court has stated, "the authority of the United States towards the CNMI arises solely under the Covenant." *Hillblom v. United States,* 896 F.2d 426, 429 (9th Cir. 1990); *see CNMI v. Atalig,* 723 F.2d 682, 687 (9th Cir.1984) (explaining that because of its powers of self-government, the CNMI is not under the plenary authority of the United States). The Covenant guarantees the CNMI a measure of self-government, giving the people of the CNMI control over its internal affairs. *Id.* § 103. Additionally, and more importantly for this case, the Covenant exempts the CNMI from U.S. immigration and naturalization laws and minimum wage laws. Covenant § 503(a), (c). The immigration exemption was originally inserted because the CNMI feared that large numbers of Asian immigrants would migrate to the CNMI under the United States' numerical quotas to take advantage of the CNMI's new affiliation with the United States. Marybeth Herald, *The Northern Mariana Islands: A Change in Course under its Covenant with the United States,* 71 Or. L.Rev. 127, 141 (1992). The exemption from American minimum wage laws reflected sensitivity to the CNMI's economic conditions. *Section–by–Section Analysis* at 57–58.

## II. The NWA

The CNMI enacted the NWA in 1983, modeling it after a nonresident workers law that had been part of the Trust Territory Code. 3 N. Mar. I.Code §§ 4411 *et seq.* (1983); Protection of Resident Workers Act, 49 Trust Territory Code § 1 *et seq.* (1970). The NWA sets conditions on and procedures for the hiring of nonresident workers. Citizens are given a general preference for all jobs. § 4413.[1] Employers who wish to hire nonresident workers must first notify the CNMI Department of Labor, which attempts to

---

1. Unless otherwise indicated, all section designations are to the NWA, 3 N. Mar. I.Code §§ 4411 *et seq.*

place residents in the position. §§ 4431, 4432. The employer must also guarantee that at least ten percent of his or her workforce is comprised of resident workers. § 4436(a). The Department of Labor preapproves all contracts between employers and nonresident workers. § 4434(a)(1). The employer must provide a surety bond guaranteeing three months of wages, medical coverage, and repatriation expenses for each nonresident worker. § 4435. The law requires employers to pay wages at least biweekly in cash, and to pay any applicable minimum wage, although the industries which employ the vast majority of temporary workers are exempted from standard minimum wage laws. §§ 4436(c); 4437(b); 4 N. Mar. I.Code §§ 9221, 9223 (exempting garment, construction, and domestic laborers). The employer is also responsible for providing for the medical expenses of any nonresident worker and for costs that may arise should the nonresident worker die during the term of employment. § 4437(c). The NWA prohibits or restricts the hiring of nonresident workers for certain specific job classifications. §§ 4434(e)(1)-(2), (h), (i).

Nonresident workers are also subject to certain requirements. When applying to work under the NWA, a nonresident worker must submit an affidavit stating that he or she meets the qualifications of the job being sought, has a minimum of two years of working experience, and has not been convicted of a felony or crime of moral turpitude. §§ 4434(b)(1), (2), (4). The worker must also disclose his or her marital status and the existence of any dependents, § 4434(b)(3), and undergo a physical examination once he or she arrives in the CNMI, § 4438. A nonresident worker is not allowed to work in the CNMI without a contract preapproved by the Department of Labor, § 4437(d), or for any other employer than the one designated on the approved contract, § 4437(e). Once hired under the NWA, a nonresident worker may not use his or her presence in the CNMI to establish citizenship or residency. § 4437(a).

III. Sagana's History

Sagana entered the CNMI in 1991 as a nonresident worker. After working as a security guard for three years, he was fired, and subsequently pursued a successful action for wrongful termination and unpaid wages. From 1994 to 2000, Sagana worked under temporary work authorization permits or as an unapproved nonresident worker. A nonresident worker employment application allegedly filed by one of Sagana's employers in October 1998 was apparently lost by the Department of Labor and Immigration, and on November 8, 2000, a Department of Labor and Immigration official determined that Sagana did not have valid work status and could not remain in the CNMI. The official ordered Sagana to depart voluntarily within twenty days. Sagana appealed the order without success.

IV. Procedural History

On December 20, 2000, Sagana filed a complaint in the Superior Court of the CNMI for declaratory and injunctive relief, monetary damages, and attorney fees under 42 U.S.C. §§ 1983 and 1988. Defendants removed the case to the CNMI district court on January 16, 2001. Some of the claims in the case were dismissed by the district court's November 23, 2001, order granting in part the defendant's motion for summary judgment; these claims are not a part of this appeal. All the rest, save one, were settled and the settlement terms memorialized in an Agreement dated November 25, 2002. The Settlement Agreement permitted Sagana to pursue his claim for a declaration whether Sagana "has the right to freely market his labor in

the common occupations of life to any prospective employer without restriction and on equal terms as any citizen for so long a period as Plaintiff is lawfully admitted to the CNMI as a nonresident worker."

The district court granted summary judgment for the respondent, Tenorio, and we review that decision *de novo.* *United States v. City of Tacoma,* 332 F.3d 574, 578 (9th Cir.2003). Upon review, our efforts are somewhat encumbered by the bulk and vague contours of Sagana's claim. The settlement agreement reduced Sagana's case to a claim that he has a right to pursue and engage in work unrestricted by the rules and procedures of the NWA. We will refer to specific sections of the statute only when necessary for analysis.

## ANALYSIS

### I. 42 U.S.C. § 1981 Claim

#### A. Dismissal on the Ground of Inadequate Pleading

The district court dismissed Sagana's 42 U.S.C. § 1981 claim on the ground that Sagana failed to raise the claim properly. The district court relied on the failure of the settlement agreement and the failure of Sagana's complaint to specifically mention § 1981.

■ Under the liberal rules of pleading, a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a). All that is required is that the plaintiff give "fair notice" of the claim and its basis. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). " 'All pleadings shall be construed as to do substantial justice,' Fed.R.Civ.P. 8(f), and '[n]o technical forms of pleading ... are required.' Fed.R.Civ.P. 8(e)(1)." *Fontana v. Haskin,* 262 F.3d 871, 877 (9th Cir. 2001).

■ The district court erred in concluding that the paragraph in the settlement agreement limited the scope of Sagana's claim. Order at 7–8 ("The paragraph does not provide any hint that Sagana is alleging ... CNMI-sponsored discrimination based on alienage."). The plain text of the paragraph is broad enough to encompass a § 1981 alienage discrimination claim:

> The parties agree that nothing in the Agreement will prevent the Plaintiff from continuing to pursue his claim against Dr. Joaquin Tenorio, in his official capacity as Secretary of [the Department of Labor and Immigration], for declaratory relief regarding the issue of whether he has the right to freely market his labor in the common occupations of life to any prospective employer without restriction and on equal terms as any citizen for so long a period as Plaintiff is lawfully admitted to the CNMI as a nonresident worker.

In both this paragraph and his complaint, Sagana asserts a right to be on "equal terms as any citizen"; he alleges discrimination on the basis of his alien status. He contends that the NWA, in limiting his ability to freely make contracts regarding his employment, violates his federally guaranteed rights. Additionally, Sagana's Motion for Leave to File Supplemental Authorities indicated that he was pursuing a § 1981 claim. *See Am. Timber & Trading Co. v. First Nat'l Bank,* 690 F.2d 781, 786 (9th Cir.1982) (holding that one party's pursuit of discovery on an issue put the opposing party on notice of the issue). Tenorio had "fair notice" of the § 1981 claim. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *accord Acequia, Inc. v. Clinton,* 34 F.3d 800, 814 (9th Cir.1994).

■ Although Sagana did not explicitly specify § 1981 in his complaint, this omission is not fatal to his claim. "A party

need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case." *Am. Timber,* 690 F.2d at 786 (citations omitted); *see also Cabrera v. Martin,* 973 F.2d 735, 745 (9th Cir.1992) (stating that pleading facts underlying a § 1983 claim without naming the actual statute is sufficient); *Haddock v. Bd. of Dental Exam'rs,* 777 F.2d 462, 464 (9th Cir.1985); *Greenwood v. Ross,* 778 F.2d 448, 454–55 (8th Cir.1985). We long ago rejected the argument that a specific statute must be named, describing it as an "attempt to evoke wholly out-moded technical pleading rules." *Bowers v. Campbell,* 505 F.2d 1155, 1157 n. 2 (9th Cir.1974). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 992 (citation, brackets and internal quotation marks omitted). Such an extreme circumstance does not exist here.

B.  Section 1981 and Alienage Discrimination

In a footnote, the district court stated in the alternative that Sagana's § 1981 claim would have been foreclosed even if the claim had been properly pleaded, because the court would have been compelled by our decision in *Magana v. CNMI,* 107 F.3d 1436 (9th Cir.1997), to dismiss a § 1981 claim based on alienage discrimination.[2] *Magana* does not support the footnote. *Magana* did not decide whether § 1981 applies to discrimination on the basis of alienage.

■  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). The right to dispose of one's labor freely by contract is at the heart of the protections afforded by § 1981. *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 441 n. 78, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

Congress chose with care the word "persons" to replace "citizens" in the statute when, in reenacting the 1866 Civil Rights Act, it extended the safeguards of the civil rights statutes to aliens.[3] *Id.* (citing Cong. Globe, 41st Cong., 2d Sess. 1536 (1870)); *accord Gen. Bldg. Contractors Ass'n., Inc. v. Pennsylvania,* 458 U.S. 375, 386–87, 102

2.  The district court footnote reads, in full: "The court concludes that no discussion is necessary regarding Sagana's argument that the Ninth Circuit 'wrongly decided' *Magana* and that § 1981 was really intended to prohibit state-sponsored discrimination based on alienage. The court is bound by *stare decisis* and may not overrule the Ninth Circuit." Order at 6–7 n. 5.

3.  Section 1981 originally appeared as § 1 of the Civil Rights Act of 1866, 14 Stat. 27, and was reenacted and slightly amended by the Act of May 31, 1870, 16 Stat. 144. *See Runyon v. McCrary,* 427 U.S. 160, 168–70 n. 8, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). We do not here recapitulate the full legislative history and historical context of § 1981. We instead gratefully acknowledge other courts' thorough investigations into the statute's origins, which provide ample edifying fodder for the hungry reader. *See, e.g., McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 287–96, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Anderson v. Conboy,* 156 F.3d 167, 172–75 (2d Cir.1998) (noting that the primary motivation for the 1870 amendment to the statutory text was to protect Chinese aliens from undue discrimination); *Bhandari v. First Nat'l Bank of Commerce,* 829 F.2d 1343, 1345–48 (5th Cir.1987), *vacated,* 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989), *reinstated,* 887 F.2d 609 (5th Cir.1989); *De Malherbe v. Int'l Union of Elevator Constructors,* 438 F.Supp. 1121, 1136–42 (N.D.Cal.1977).

S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Anderson,* 156 F.3d at 173 ("The use of 'persons' rather than 'citizens' was deliberate."). In *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Supreme Court determined that states could not restrict the eligibility for welfare benefits solely on the basis of alienage. The Court cited § 1981 to show Congress's intention to provide protections to "[a]ll persons within the jurisdiction of the United States," and went on: "The protection of this statute has been held to extend to aliens as well as to citizens." *Id.* at 377, 91 S.Ct. 1848 (citing *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419 n. 7, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948)); *see also Duane v. GEICO,* 37 F.3d 1036, 1040 (4th Cir.1994). In interpreting a different part of § 1981's precursor statute, our court agreed, holding that the phrase "all persons within the jurisdiction of the United States" was specifically intended to encompass aliens. *United States v. Otherson,* 637 F.2d 1276, 1282 (9th Cir.1980).

■ The question of who can claim the protections of § 1981 is different from that which asks what protections it affords. Both the Supreme Court and other circuit courts have considered § 1981 to protect primarily against racial discrimination. *See, e.g., Keating v. Carey,* 706 F.2d 377, 384 (2d Cir.1983) ("[A]lthough the courts have not limited the statute's proscription of racial discrimination by employing a 'technical or restrictive meaning' of 'race,'

neither have they strayed far from a racial discrimination analogy." (internal citation omitted)). The text of § 1981 circumscribes the kinds of protections that may be claimed under its auspices. The guarantee that "all persons" may enjoy the same rights that "white citizens" enjoy does not protect against discrimination on the basis of gender or religion, *Runyon,* 427 U.S. at 167, 96 S.Ct. 2586; disability, *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1411 (10th Cir.1997); age, *Kodish v. United Air Lines, Inc.,* 628 F.2d 1301, 1303 (10th Cir.1980); or political affiliation, *Keating,* 706 F.2d at 384.

However, the text also supports the interpretation that it bars alienage discrimination. Just as the word "white" indicates that § 1981 bars discrimination on the basis of race,[4] the word "citizen" attests that a person cannot face disadvantage in the activities protected by § 1981 solely because of his or her alien status. For protection against alienage discrimination to be excluded from § 1981, the text would have to disclaim the citizenship distinction by comparing "all persons" to "white persons," or "all citizens" to "white citizens,"[5] instead of "all persons" to "white citizens," as the statute now reads. The significance we attach to the drafters' changing "all citizens" to "all persons" to hold that aliens fall under the statute's protections, also compels the conclusion that § 1981 protects against discrimination on the basis of alienage.

---

4. The cases track the courts' heroic efforts to determine what constitutes "white-ness" and "race" for the purposes of a § 1981 claim. *See, e.g., Al–Khazraji v. St. Francis Coll.,* 784 F.2d 505, 517 n. 17 (3d Cir.1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (collecting cases considering the claims of "nontraditional" § 1981 plaintiffs).

5. Sagana's claim of invidious discrimination based on his alien status is unlike a claim under Title VII, which specifies the types of discrimination prohibited (race, color, religion, sex, and national origin). No such specifications limit § 1981's language barring alienage discrimination. *Cf. Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) (interpreting Title VII to protect aliens but, because the statute specifically names national origin and not alienage as a prohibited distinction, "nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage.")

The Supreme Court has held that § 1981 prohibits alienage discrimination. *Takahashi*, 334 U.S. at 419–20, 68 S.Ct. 1138 ("[§ 1981] and the Fourteenth Amendment on which it rests in part protect 'all persons' against state legislation bearing unequally upon them either because of alienage or color."); *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). More recently, in *Graham*, the Supreme Court cited § 1981 in a Fourteenth Amendment case to show that Congress intended aliens to enjoy broad constitutional rights regardless of their economic circumstances. *Graham*, 403 U.S. at 377, 91 S.Ct. 1848. It is settled that § 1981 prohibits governmental discrimination on the basis of alienage. *Bhandari*, 829 F.2d at 1349 n. 13; *Anderson*, 156 F.3d at 173–75 (using the text and legislative history of the 1870 Voting Rights Act to show that Congress intended § 1981 to bar alienage discrimination); *Duane*, 37 F.3d at 1040.[6]

Nothing in *Magana* precludes the employment of § 1981 to protect those who suffer discrimination because of their alienage. In *Magana*, we reversed the district court's holding that a plaintiff could not seek remedy under § 1981 for discrimination based upon the plaintiff's "nation of origin." *Magana*, 107 F.3d at 1446. *Magana* held that the plaintiff had, in fact, successfully alleged a claim of discrimination based on "race, ancestral or ethnic discrimination," and had therefore avoided the direct question of whether "nation of origin" discrimination could support a § 1981 claim. *Id.* at 1447.[7] *Magana* may be read to imply that § 1981 does not protect against discrimination on the basis of *national origin*, and such a reading would be consistent with the Supreme Court's language and plain holdings of our sister circuits. *See St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (indicating that a claim based "solely on the place or nation of his origin, or his religion" could not form the basis of a § 1981 claim); *Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 50 (7th Cir.1984) (per curiam); *Keating*, 706 F.2d at 384; *Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634 (5th Cir.1981). This does not foreclose § 1981's recognition of alienage discrimination. "Alienage discrimination is distinct from both national-origin and birthplace discrimination." *Anderson*, 156 F.3d at 171 n. 5; *accord Espinoza*, 414 U.S. at 95, 94 S.Ct. 334 (holding that a statute that specifically prohibited national-origin discrimination

---

**6.** Decisions from other circuits make clear that distinctions made by governmental actors come within § 1981's purview. The current controversy over alienage discrimination under § 1981 focuses on whether private distinctions on the basis of alienage are barred. *Compare Bhandari*, 829 F.2d at 1349, 1351–52 (holding that § 1981 does not prohibit private alienage discrimination) *with Duane*, 37 F.3d at 1042–43 (§ 1981 does prohibit private alienage discrimination) *and Anderson*, 156 F.3d at 180 (same).

**7.** The most relevant parts of *Magana* state:

In addressing Magana's § 1981 claim, the district court cited portions of Magana's deposition. The court noted that when Magana was asked by why she thought she was being discriminated against, she answered: "because she was from the Philippines." From this, the court concluded that Magana alleged possible "nation of origin" discrimination, rather than racial, ancestral or ethnic discrimination....

The deposition transcript and Magana's complaint demonstrate that Magana ... did not limit her discrimination allegations to national origin. She also alleged racial, ancestral or ethnic discrimination and consistently alleged that she was discriminated against "because of her race." ...

We are satisfied that her pleadings met the requirements for a claim of discrimination under § 1981.

*Magana*, 107 F.3d at 1446–47 (citations omitted).

did not protect against alienage discrimination). Any language in *Magana* about national-origin discrimination has no bearing on alienage discrimination claims under § 1981.

■ We hold that § 1981 prohibits governmental discrimination on the basis of alienage.

## C. Application of § 1981 in the CNMI

■ Tenorio argues that the district court's dismissal was also correct because § 1981 does not apply to the CNMI's immigration laws. Tenorio argues that the exemption in Covenant § 503(a) handed a generalized immigration power to the CNMI and that this power entitles the CNMI to plenary authority and judicial deference in its regulation of aliens. Tenorio reads more into § 503(a) than the section was intended to carry.

Immigration authority controls, who, where, when, how, and for how long, and the conditions under which, a visitor may enter and remain in a territory, but it does not necessarily deal with all the rights and duties of persons in a given jurisdiction after the entry has taken place. We need not reach the outer limits of the power of the CNMI with reference to residents, nonresidents, temporary workers, and other visitors.

The Covenant provides that, with a few exceptions, all laws in existence at the time of the Covenant's passage apply in the CNMI. Covenant § 502(a). The CNMI agreed to be bound by the dictates of the Thirteenth and Fourteenth Amendments and the statutes enforcing them. *Id.* §§ 501(a), 502(a).

In short, nothing in Covenant § 503 prevented the district court from reaching the merits on this issue.

## II. Fourteenth Amendment Equal Protection Claim

The district court ruled against that part of Sagana's claim asserted under the Fourteenth Amendment's Equal Protection Clause, applying rational basis scrutiny to deny his challenge to the NWA. Sagana appeals both the choice of scrutiny and the decision on the merits.

■ The Fourteenth Amendment applies to the CNMI "as if the Northern Mariana Islands were one of the several states." *Id.* § 501(a); *Basiente v. Glickman*, 242 F.3d 1137, 1143 (9th Cir.2001); *Madarang v. Bermudes*, 889 F.2d 251, 252 (9th Cir.1989). Aliens who are in the jurisdiction of the United States under any status, even as illegal entrants or under a legal fiction, are entitled to the protections of the Fourteenth Amendment. *Plyler v. Doe*, 457 U.S. 202, 211, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Yick Wo*, 118 U.S. at 369, 6 S.Ct. 1064; *Wong v. INS*, 373 F.3d 952, 972–74 (9th Cir.2004).

■ Equal protection claims are considered under a two-step analysis. First, an appellant must show that the statute in question "results in members of a certain group being treated differently from other persons based on membership in that group." *United States v. Lopez–Flores*, 63 F.3d 1468, 1472 (9th Cir.1995). This hurdle is easily cleared. It is uncontested that the NWA is a discriminatory statute, treating nonresidents differently from residents and citizens. Order at 11; *see* 4 N. Mar. I.Code § 4411 (1999).

■ In the second step, a court assesses the legitimacy of a discriminatory statute under the appropriate level of scrutiny. The CNMI courts have twice employed intermediate scrutiny in assessing laws discriminating against or among aliens, including when examining provisions of the NWA. *Sirilan*, 1 N. Mar. I. Commw. Rptr.

at 1118–19 (rejecting, under intermediate scrutiny, a CNMI constitutional challenge to the termination of the CNMI permanent resident program); *Kin v. N. Mariana Islands,* 1989 WL 311391, 3 N. Mar. I. Commw. Rptr. 608, 612 (D.N. Mar. I.1989) (applying intermediate scrutiny under the U.S. Constitution to strike down an NWA section that provided for the retroactive deportation of the families of workers earning less than $20,000 per year); *see also Yang v. Amer. Int'l Knitters Corp.,* 789 F.Supp. 1074, 1078 (D.N.M.I.1992) (holding that a provision of the NWA would fail under either rational or intermediate scrutiny). The CNMI government argues that we should exercise rational basis review rather than intermediate scrutiny, because the Covenant grants the CNMI the same plenary immigration power enjoyed by the United States. We need not reach the question of what level of scrutiny to apply, as the NWA survives under either rational or intermediate levels of review.

When enacting the NWA, the CNMI legislature stated that "it is essential to a balanced and stable economy in the Commonwealth that residents be given preference in employment and that any necessary employment of nonresident workers in the Commonwealth not impair the wages and working conditions of resident workers." § 4411(a); *see also Saipan Hotel v. NLRB,* 114 F.3d 994, 996 (9th Cir. 1997). The legislature also recognized that the stagnant CNMI economy needed temporary alien labor because the small resident working force was substantially occupied in public sector employment. § 4411(a). Additionally, the legislature sought to provide "enforcement, control and regulation of nonresident workers." § 4411(b).

The CNMI legislature has seen fit to create a temporary class of employees for the purpose of bolstering the CNMI economy, giving job preference to its residents, and protecting the wages and conditions of resident workers while enforcing a system to control and regulate its visiting laborers. These are reasonable, important purposes. *See Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 893, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (recognizing the protection of American workers as a legitimate goal of immigration restrictions); *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183, 194, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) (same); *Kin,* 1989 WL 311391, 3 N. Mar. I. Commw. Rptr. at 613 (finding that "controlling and regulating nonresident workers is an important governmental interest").

The key provisions of the NWA—those which set a preference for resident workers, § 4413, create procedures by which the government and employers coordinate to place residents in job openings, §§ 4431, 4432, set up a system for the government approval of nonresident labor contracts, §§ 4433, 4434, and facilitate enforcement and administrative review of the NWA program, §§ 4441–46—are all sufficiently tied to the purposes stated above. Sagana has not shown that the NWA is not closely related to the CNMI's important governmental goals of boosting its economy, giving preference to its resident workers, and providing a system of regulating and accounting for its nonresident workforce. The limitation of Sagana's ability to contract his labor under the NWA does not violate his equal protection rights.

In holding that the NWA as a whole passes both rational basis review and intermediate scrutiny, we take no position on whether individual sections of the NWA would satisfy a more focused Equal Protection challenge. Our decision does not foreclose the possibility that discrete elements of the CNMI's temporary worker

program could violate the equal protection rights of nonresident workers.[8]

Sagana does not prevail on his equal protection claim whether considered under rational basis review or intermediate scrutiny because he has not carried his burden to show that the NWA is not closely related to the CNMI's important government goals. Accordingly, the district court did not err in denying relief on Sagana's equal protection claim. We turn now to Sagana's due process claim.

## III. Fourteenth Amendment's So–Called Substantive Due Process [9] Claim

■■■ The Fourteenth Amendment's Due Process Clause states, "[Nor] shall any State deprive any person of life, liberty, or property, without due process of law." The substantive component of this Clause "bar[s] certain government actions regardless of the fairness of the procedures used to implement them...." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (citation omitted). By doing so, "it serves to prevent governmental power from being 'used for purposes of oppression.' " *Id.* at 331–32, 106 S.Ct. 662 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 277, 15 L.Ed. 372 (1855)). The Due Process Clause prohibits restraints on liberty that are arbitrary and purposeless, *Poe v. Ullman*, 367 U.S. 497, 543, 81 S.Ct.

1752, 6 L.Ed.2d 989 (1961), but a claim under this clause is "cognizable only if there is a recognized liberty or property interest at stake." *Schroeder v. McDonald*, 55 F.3d 454, 462 (9th Cir.1995) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); *see also Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir.1994). "[T]he Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotation marks and citations omitted).

Restrictions on selecting and pursuing work are recognized by the Fourteenth Amendment's Due Process Clause. "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915) (citations omitted). More recently, the Supreme Court stated that "the Fourteenth Amendment's Due Process Clause includes some generalized

8. Two separate provisions of the NWA already have been struck down on equal protection grounds. Section 4437(i) was found to violate equal protection by providing that immediate relatives of nonresident workers could not enter the CNMI unless the nonresident worker earned more than $20,000 and posted a bond to guarantee his or her dependents' repatriation costs. *Kin*, 1989 WL 311391, 3 N. Mar. I. Commw. Rptr. 608. Section 4434(f), barring nonworker residents from accessing the courts, was also stricken as unconstitutional. *Kei*, 789 F.Supp. 1074.

9. This linguistically awkward juxtaposition of substance and process has embedded itself in constitutional jurisprudence, over the objection of some Supreme Court Justices and scholars. *See, e.g., Bowers v. Hardwick*, 478 U.S. 186, 191, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); Alexander M. Bickel, *The Morality of Consent* (1975); John Hart Ely, *Foreword: On Discovering Fundamental Values*, 92 Harv. L.Rev. 5 (1978); Harry H. Wellington, *Common Law Rules and Constitutional Double Standards: Some Notes on Adjudication*, 83 Yale L.J. 221 (1973).

due process right to choose one's field of private employment." *Conn v. Gabbert,* 526 U.S. 286, 291–92, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); *see also Ry. Employees' Dep't v. Hanson,* 351 U.S. 225, 234, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) ("[T]he right to work, which the Court has frequently included in the concept of 'liberty' within the meaning of the Due Process Clauses may not be denied by the Congress." (citations omitted)); *Schware v. Bd. of Bar Exam'rs,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Terrace v. Thompson,* 263 U.S. 197, 215, 44 S.Ct. 15, 68 L.Ed. 255 (1923) (protecting the "right to earn a livelihood by following the ordinary occupations of life"); *Dittman v. California,* 191 F.3d 1020, 1029 (9th Cir.1999).

However, as we recognized in *Dittman,* 191 F.3d at 1031 n. 5, the Court has never held that the right to pursue work is a fundamental right. The Court has stated that the "generalized" right to choose one's employment "is nevertheless subject to reasonable government regulation." *Conn,* 526 U.S. at 292, 119 S.Ct. 1292. Our court has described the judicial review which applies to laws infringing on nonfundamental rights as a very narrow one. "[W]e do not require that the government's action actually advance its stated purposes, but merely look to see whether the government *could* have had a legitimate reason for acting as it did." *Wedges/Ledges,* 24 F.3d at 66 (emphasis in original). Sagana's claim fails. As explained above, there are legitimate reasons for creating and maintaining a temporary worker program, and in pursuing those goals, the CNMI violates no constitutional principles by conditioning an alien's entry on his or her willingness to enter into limited labor contracts.

IV. Conclusion

Our task here is to determine only whether the CNMI, by limiting a nonresident alien's ability to seek and engage in employment as a condition for entry, violates that alien's constitutional rights under the Fourteenth Amendment. Viewed at that level of abstraction, the NWA withstands challenge. We affirm the district court's summary judgment for the respondent on the equal protection and due process claims. Although we reject the district court's conclusion that Sagana did not properly plead his § 1981 claim, we affirm the district court's dismissal on its merits, consistent with our holding on the equal protection claim. *See Gratz v. Bollinger,* 539 U.S. 244, 275–76, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003); *Grutter v. Bollinger,* 539 U.S. 306, 343, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (citing *Gen. Bldg. Contractors Ass'n,* 458 U.S. at 389–91, 102 S.Ct. 3141, for the proposition that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause").

**AFFIRMED.**